UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/13/2020

MEGHAN GEORGE, *on behalf of herself
and all others similarly situated,*

                    Plaintiff,

          v.                                          No. 17-CV-6663 (RA)

SHAMROCK SALOON II LLC, *doing                        ORDER ADOPTING
business as* CALICO JACK'S CANTINA;            REPORT AND RECOMMENDATION
BLITZ MARKETING, LLC; JOHN L.
SULLIVAN; and DOES 1 THROUGH 20
*inclusive, and each of them,*

                    Defendants.

RONNIE ABRAMS, United States District Court Judge:

        Plaintiff, on behalf of herself and others similarly situated, brings this action against

Defendants Shamrock Saloon II LLC, doing business as Calico Jack's Cantina ("Calico Jack's"),

Blitz Marketing, LLC, John L. Sullivan, and Does 1 through 20. She alleges that Defendants

violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, by sending

dozens of text messages advertising events and specials at Calico Jack's to her cell phone

number without her consent using an automated telephone dialing system ("ATDS"). Plaintiff

moved for an order certifying a class pursuant to Federal Rule of Civil Procedure 23.

        Before the Court is Magistrate Judge Pitman's Report and Recommendation ("Report"),

dated August 7, 2019, recommending that the Court grant Plaintiff's motion. Specifically, the

Report recommends that the Court certify a class "consisting of the 67,630 individuals (1) to

whom defendants sent promotional text messages between March 26, 2015 and September 1,

2017 using an automated dialing system and (2) from whom defendants cannot affirmatively

show that they received prior express written consent to receive such text messages." Rpt. at 10.[1]

On August 21, Defendants filed their objections to the Report. Plaintiff responded on September 25. The Court assumes the parties' familiarity with the facts, as outlined in the Report. After reviewing the Report and objections, the Court adopts Judge Pitman's well-reasoned recommendation in its entirety and grants Plaintiff's motion to certify the class.

## LEGAL STANDARDS

When a magistrate judge issues a report and recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made [therein]." 28 U.S.C. § 636(b)(1)(C). "When a timely and specific objection to a report and recommendation is made, the Court reviews *de novo* the portion of the report and recommendation to which the party objects." *Tagliaferri v. United States*, No. 17-CV-3026 (RA), 2019 WL 498361, at *1 (S.D.N.Y. Feb. 8, 2019); *see also Time Square Food Imps. LLC v. Philbin*, No. 12-CV-9101 (PAE), 2014 WL 521242, at *2 (S.D.N.Y. Feb. 10, 2014) (requiring objections to be "specific and clearly aimed at particular findings in the magistrate judge's report"). Portions of a report not subject to a proper objection are reviewed for clear error. *See Razzoli v. Fed. Bureau of Prisons*, No. 12-CV-3774 (LAP), 2014 WL 2440771, at *5 (S.D.N.Y. May 30, 2014). "[T]o the extent . . . that the party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the [report and recommendation] strictly for clear error." *IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*, No. 07-CV-6865 (LTS), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008).

---

[1] The opinion uses the following citations: "Rpt." for Judge Pitman's Report; "Defs.' Obj." for Defendants' objections to the Report; "Pl.'s Obj. Reply" for Plaintiff's response to Defendants' objections; "Defs.' Opp." for Defendants' underlying opposition brief to Plaintiff's class certification motion; "Pl.'s Reply" for Plaintiff's reply brief to Defendants' underlying opposition brief; and "Expert Rpt." for Plaintiff's expert report.

Before granting a class certification motion – as is the subject of Judge Pitman's Report – "a court must ensure that the requirements of Rule 23(a) and (b) have been met." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006). Rule 23(a) has four prerequisites: numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a). "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). "If the Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b)." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464 (2d Cir. 2013). As relevant here, Rule 23(b)(3) provides "two additional requirements": "predominance, *i.e.*, law or fact questions common to the class predominate over questions affecting individual members, and superiority, *i.e.*, class action is superior to other methods." *In re Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006). The party seeking certification must prove these requirements by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

## DISCUSSION

Defendants timely raised three objections to the Report. Two of the objections are new arguments against class certification that were not presented to Judge Pitman. The third objection reiterates an argument that Defendants made in their underlying brief opposing class certification and was addressed by Judge Pitman. For reasons explained below, the Court does not consider Defendants' first two objections, reviews the third objection for clear error, and evaluates the remainder of Judge Pitman's Rule 23 findings, to which Defendants did not object, also for clear error.

## I.    Defendants' Objections to the Report

### A. Two Newly Raised Arguments Against Class Certification

"[W]hether a party may raise a new legal argument . . . for the first time in objections to

[a magistrate judge's report and recommendation] has not yet been decided in this Circuit." *Levy*

*v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 433 (S.D.N.Y. 2015). As such, courts in this

circuit address this issue in one of two ways. Some courts hold that "new arguments and factual

assertions cannot properly be raised for the first time in objections to the R&R, and indeed may

not be deemed objections at all." *Tarafa v. Artus*, No. 10-CV-3870 (AJN), 2013 WL 3789089, at

*2 (S.D.N.Y. July 18, 2013); *see also Cabrera v. Schafer*, No. 12-CV-6323, 2017 WL 1162183,

at *2 (E.D.N.Y. Mar. 27, 2017). The reasoning is that reviewing arguments for the first time at

this late stage "would negate efficiencies gained through the Magistrates Act and would permit

litigants to change tactics after the issuance of an R&R." *Amadasu v. Ngati*, No. 05-CV-2585

(RRM), 2012 WL 3930386, at *5 (E.D.N.Y. Sept. 9, 2012). Other courts consider six factors in

determining whether to exercise their discretion and address a newly-raised argument:

> (1) the reason for the litigant's previous failure to raise the new legal argument; (2) whether
> an intervening case or statute has changed the state of the law; (3) whether the new issue is a
> pure issue of law for which no additional fact-finding is required; (4) whether the resolution
> of the new legal issue is not open to serious question; (5) whether efficiency and fairness
> militate in favor or against consideration of the new argument; and (6) whether manifest
> injustice will result if the new argument is not considered.

*Parks v. Comm'r of Soc. Sec.*, No. 15-CV-6470 (ER), 2017 WL 3016946, at *3 (S.D.N.Y. July

17, 2017).

In their objections to the Report, Defendants challenge Plaintiff's expert's findings for

the first time. With full access to Defendants' Call Fire account (through which Defendants store

collected phone numbers and draft and schedule mass text message promotional campaigns), the

expert found that 67,630 unique cell phone numbers received text messages between March 26,

4

2015 and September 1, 2017 from Defendants without consent provided "in the handwritten sheets completed by customers at the restaurant . . . [or] on the website content list." Expert Rpt. ¶¶ 55. Furthermore, before Judge Pitman, "both sides appear[ed] to agree that [D]efendants' text messages contained 'advertisements' as defined by the FCC." Rpt. at 7 n.1. 67,630 was thus proposed – and adopted – as the scope of the class.

Now, however, Defendants claim that they never agreed that all 67,630 individuals received messages with an advertisement. Instead, "absolutely . . . **not** conced[ing] that every single text that was sent using the Call Fire platform . . . qualify as 'advertisements' under the TCPA," they assert that only those individuals on their General Mailing List – a number about half the size of the proposed class – received text messages with an advertisement. Defs.' Obj. at 16. Defendants, therefore, contend that the Report erred in "conclud[ing] that there were 67,630 individuals who received the text message promotions sent to Plaintiff between March 26, 2015 and September 1, 2017." *Id.*; *see also id.* at 8 ("[T]he discrepancy between the actual number of individuals who were on the General Mailing List and the number asserted by Hansen was," according to Defendants, "due to Hansen's inclusion in all contact numbers – *on any list* – within the Call Fire database.").

Yet, despite the fact that the expert report was available to Defendants prior to and during initial briefing, Defendants never before questioned the expert's findings or whether the text messages included an advertisement. Nor did Defendants' 30(b)(6) witness, in her deposition, ever address this alleged distinction between individuals on the General Mailing List and other lists. Notably, Plaintiff's reply brief to Defendants' underlying opposition brief even noted that "Defendants do not contest the numbers." Pl.'s Obj. Reply at 3. It is, therefore, unclear to the Court why Defendants did not previously raise this if the "distinction is [as] important" as they

now assert. Defs.' Obj. at 6. This is particularly so given that Defendants agreed to give

Plaintiff's expert full access to their Call Fire account and stipulated to the authenticity of that

information in order to avoid a second 30(b)(6) deposition. *See* Dkt. 56 (Stipulation & Order

Regarding the Authenticity of Defendants' Call Fire Records).[2]

Defendants' second new argument is that they do not need to prove "prior express written

consent" with documentary evidence because witness testimony is sufficient. Defendants

primarily cite Pamela Killian's 30(b)(6) deposition, in which she testified that Defendants

obtained customers' cell phone numbers via only two methods: sign-up sheets circulated in the

bar and their website. Relying on a single case from the Western District of Ohio, Defendants

now claim this testimony is sufficient to establish consent. *See* Defs.' Obj. at 21-22 (citing

*Sawyer v. KRS Biotechnology Inc.*, No. 16-CV-550, 2018 WL 2425780 (W.D. Ohio May 30,

2018)). Defendants, however, did not previously argue that relying solely on witness testimony

was adequate proof, perhaps because Ms. Killian testified that she had never personally used Call

Fire and thus offered little insight into Defendants' messaging.[3] *See* Killian Dep. 34:14-17.

Ultimately, the Court takes no position on whether a new argument first raised in

objections to a magistrate judge's report and recommendation can ever be considered. Here,

even applying the six-factor test used by some courts, Defendants' two new arguments against

class certification do not warrant review. Defendants could have raised each of these arguments

---

[2] Even if the Court were to consider Defendants' argument regarding the number of individuals who received promotional texts during the class period, it would fail. To dispute the expert's finding, Defendants submitted three screenshots of the General Mailing List to prove it had less than 67,630 individuals on it. *See* Defs.' Obj., Ex. F, G, H. These screenshots, however, offer no insight into the content of the messages that anyone on the General Mailing List or any other mailing list received. Moreover, the submitted screenshots are from August 7, 2018, and thus not even accurate reflections of the mailing lists during the proposed class period. *See* Dkt. 85, Ex. A (Declaration of Vincent Avery).

[3] Moreover, *Sawyer* – the single case that Defendants rely on – addresses a different TCPA provision involving junk fax violations, which, unlike the TCPA provision applicable here, does not require written consent. *See* 47 U.S.C. § 227(b)(1)(C).

6

in their underlying briefing. They have not explained why they did not so. Notably, neither argument relies on intervening law or evidence. Moreover, Defendants' argument regarding the expert report would require additional fact-finding about the text messages sent by Call Fire during the proposed class period. Because the parties have engaged in discovery after which Judge Pitman issued a detailed Report, neither "efficiency [nor] fairness militate in favor . . . [of] consideration of the new argument." *Parks*, 2017 WL 3016946, at *3. To consider either now "would negate efficiencies gained through the Magistrates Act and . . . permit [Defendants] to change tactics after the issuance of [the] R&R." *Amadasu*, 2012 WL 3930386, at *5 (citation omitted).

Accordingly, these arguments "may not be deemed objections at all." *3 W. 16th St., LLC v. Commonwealth Land Title Ins. Co.*, No. 18-CV-1914 (AT), 2019 WL 1397135, at *2 (S.D.N.Y. Mar. 28, 2019).[4]

## B. Previously Raised Argument Against Class Certification

In their objections, Defendants contend that, "to the extent Magistrate Pitman's recommendation that class certification is warranted was based on his conclusion that 'there is no need for an individualized inquiry concerning the issue of consent,' it was mistaken." Defs.' Obj. at 16 (internal citation omitted). According to Defendants, because Plaintiff "acknowledge[s] . . . that she had been receiving promotional texts regarding Calico Jack's events prior to 2013," her "claim is evaluated under the old standard," not the "prior express written consent" standard established in the FCC's 2012 Order.[5] *Id.* at 13. Judge Pitman erred,

---

[4] Defendants may, however, use Ms. Killian's testimony should they choose to raise consent as an affirmative defense after the class is certified.

[5] Because Judge Pitman already detailed the TCPA's structure and the FCC's governing regulations, the Court will not repeat it here in detail. *See* Rpt. at 4-7. In brief, however, the FCC has interpreted the TCPA to extend to text messages. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 88 (2d Cir. 2019). Prior to the FCC's 2012 Order, the FCC required "prior express consent" before sending a text message with an

they say, in finding "that consent obtained prior to the effective date of the FCC's 2013 Order was invalidated by the Order, itself."[6] *Id.* at 13; *see also id.* at 14 ("[Judge Pitman's] conclusion is based on the assumption that the 2013 FCC Order effectively invalidated all existing consents received by Calico Jack's prior to the Order's effective date[.]").

But this argument was the focus of Defendants' underlying opposition brief. In contesting whether either typicality or predominance could be established, Defendants argued:

> Plaintiff is attempting to certify a class of individuals based on evidence that applies to a particular legal standard for determining whether or not a customer provided 'express consent' to send him/her promotional text messages – except, unfortunately for Plaintiff, that particular standard does not apply to her own individual claim, as it was not in effect at the time defendants obtained her number and began sending her the promotional texts in question.

Defs.' Opp. at 1. Defendants thus urged that Plaintiff's claim is not typical of the class members' claims because "her individual TCPA claim must be adjudicated under a 'prior express consent' standard, rather than the more stringent 'prior express written consent' standard." Rpt. at 11. In that same vein, Defendants suggest that predominance could not be met "because individual issues with respect to whether each class member gave the requisite consent to receive text messages would require an individual analysis of each class member's claim." *Id.*

Because Defendants raised this argument before Judge Pitman, the Court reviews it here for clear error. *See IndyMac Bank, F.S.B.*, 2008 WL 4810043, at *1 ("[T]o the extent . . . that the party . . . simply reiterates the original arguments, the Court will review [it] strictly for clear

---

"advertisement." But since the FCC's 2012 Order took effect on October 16, 2013, a text message with an "advertisement" requires "prior express *written* consent." *See* 47 C.F.R. § 64.1200(a)(2) (emphasis added); *see also Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 843-44 (S.D.N.Y. 2017).

[6] References here to the FCC's 2012 and 2013 Orders are to the same order. The FCC issued the relevant order in February 2012, but it did not take effect until October 2013. *See* 47 C.F.R. § 64.1200(f)(8) (defining "prior express written consent").

error."). After review, the Court finds no clear error in Judge Pitman's determination that the "prior express written consent" standard established in the FCC's 2012 Order applies to Plaintiff's claim, and that Plaintiff thus can prove typicality and predominance.

The FCC's 2012 Order applies to Plaintiff's claim because, even though Defendants obtained her number prior to the Order, the relevant text messages were sent to Plaintiff after it took effect. Other courts have reached the same conclusion. In *Larson v. Harman Management Corporation*, for instance, the court was presented with similar facts. The defendants obtained the plaintiff's number in 2012, under circumstances that would have satisfied the FCC's prior (and then-applicable) consent standard. *Larson*, No. 16-CV-00219, 2016 WL 6298528, at *1 (E.D. Cal. Oct. 27, 2016). The defendants, however, continued to send the text messages through 2016 – that is, after the FCC's 2012 Order took effect. Rejecting the defendants' argument that the FCC's 2012 Order was "inapplicable to this lawsuit," the court reasoned that "the TCPA applies to each 'call' made, rather than the date upon which an alleged marketing campaign began." *Id.* at *3 n.1. Therefore, "[b]ecause at least some of the allegedly violative text messages were received in 2014 . . . the FCC's new rules, promulgated in 2013, are applicable to this case." *Id.*

Likewise, in *Lennartson v. Papa Murphy's Holdings, Inc.*, the plaintiff had registered in 2012 on the defendant's website to receive promotional text messages, but continued to receive messages through 2015. No. 15-CV-5307, 2016 WL 51747, at *1 (W.D. Wash. Jan. 5, 2016). The plaintiff argued that, as to any texts sent after October 16, 2013, the defendant was not in compliance with the FCC's 2012 Order because the Order "did not grandfather existing written consents that did not meet the definitional requirements of 'prior express written consent.'" *Id.* at *3. Agreeing with the plaintiff, the Court noted that "Papa Murphy's did not follow the 2012

Order's requirements, nor did it petition the FCC for clarification or relief," and as such "failed to comply with the 2012 Order." *Id.* at \*3-4; *see also Snyder v. iCard Gift Card, LLC*, No. 15-CV-61718, 2016 WL 7507994, at \*6 (S.D. Fla. May 16, 2016) (holding that, although the defendants obtained the plaintiff's number in May 2013, they did not have consent to text the plaintiff in 2015 because the consent standard depends on *when* the text was sent).[7]

In addition to this case law, the FCC's orders provide guidance. The FCC's 2012 Order directly addressed when the change to the consent standard would take effect. It implemented a twelve-month "safe harbor" period to "allow[] a reasonable time for affected parties to implement necessary changes in a way that makes sense for their business models." FCC Report & Order ¶ 66, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* (Feb. 15, 2012). Then, in 2015, after several organizations sought "relief from or clarification of the prior-express-written-consent rule that became effective October 16, 2013," the FCC issued a follow-up order addressing whether the FCC's 2012 Order "nullif[ied] those written express consents already provided by consumers before that date." FCC Declaratory Ruling & Order ¶ 98, *In the Matter of Rules and Regulations Implementing the*

---

[7] Other district courts have also held that whether the FCC's 2012 Order governs depends on when the text was received, not when the individual's number was obtained. This is best illustrated in how district courts have recently defined the scope of proposed TCPA classes. *See, e.g., Trenz v. On-line Adm'rs, Inc.*, No. 15-CV-8356, 2017 WL 6539019, at \*2 (C.D. Cal. Sept. 25, 2017) (splitting the class into two groups – those who received calls "Pre-October 16, 2013" and those who received calls "Post-October 16, 2013"); *Meyer v. Bebe Stores, Inc.*, No. 14-CV-267, 2016 WL 8933624, at \*12 (N.D. Cal. Aug. 22, 2016) (defining a TCPA class as "[a]ll persons within the United States who provided their mobile telephone number to bebe in one of bebe's stores at the point-of-sale and were sent an SMS or text message from bebe during the period of time beginning October 16, 2013 and continuing until the date the Class is certified, who were not members of Club bebe during the Class Period"); *see also Walintukan v. SBE Entm't Grp., LLC*, No. 16-CV1311, 2017 WL 635278, at \*3 (N.D. Cal. Feb. 15, 2017) (referring to October 16, 2013 as "the date when the definition of consent under the TCPA was reinterpreted to create a higher threshold for consent").

In arguing that the prior standard applies to Plaintiff's claim, Defendants rely on a single case from the Central District of California, which "held that an individual's decision to provide his/her cellphone number in writing for the specific purpose of seeking promotional text messages satisfies the more stringent 'prior written consent' standard under the 2013 FCC Order, because in such cases, it is the customer who is seeking such promotional text messages to begin with." Defs.' Obj. at 14 (relying on *Pietzak v. Microsoft Corp.*, No. 15-CV-5527, 2015 WL 7888408 (C.D. Cal. Nov. 17, 2015)). In light of the other case law, the FCC's clear requirement for "prior express written consent," and *Pietzak*'s limited analysis, the Court does not find this case persuasive.

*Telephone Consumer Protection Act of 1991* (July 10, 2015).[8] In unambiguous terms, the FCC stated: "It follows that the rule applies per call and that telemarketers should not rely on a consumer's written consent obtained before the current rule took effect if that consent does not satisfy the current rule." *Id.* ¶ 100.

Judge Pitman, therefore, correctly concluded that it is irrelevant that Defendants obtained Plaintiff's number prior to the FCC's 2012 Order. Because this action concerns only the messages sent to Plaintiff *after* that Order took effect, the relevant issue is solely whether Defendants had the consent required in the FCC's 2012 Order to message Plaintiff.[9]

With only one consent standard applicable to both Plaintiff's and the putative class members' claims, Judge Pitman rightly found typicality and predominance satisfied. "To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Flag Telecom Holdings Ltd., Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted). Here, that is true. A single inquiry applies to the entire class: whether Defendants sent the 67,630 people a text message between March 26, 2015 and September 1, 2017 using an ATDS without receiving consent in accordance with the FCC's 2012 order. It was certainly not clear error, therefore, to conclude that "the

---

[8] "The FCC's 2015 Order clarified its 2012 Order. The 2015 consent requirements were not an abrupt shift in the law, but rather, an affirmation of a rule articulated three years earlier [in the 2012 Order]." *Lennartson*, 2016 WL 51747, at *3.

[9] Even if the Court agreed with Defendants' argument about what consent standard apply, it would still fail under clear error review. Defendants have not established that they ever received consent – written or oral – from Plaintiff prior to the FCC's 2012 Order, and thus it would make no difference what consent standard applied. Plaintiff, by contrast, has presented evidence that Defendants *never* obtained her consent. The expert report, for instance, identifies her number among a list of 67,630 numbers who were contacted without consent provided "in the handwritten sheets completed by customers at the restaurant . . . [or] on the website content list." Expert Rpt. ¶ 55. While Defendants dispute the plausibility of the expert's findings, they only surmise that they obtained Plaintiff's number from her or a friend while she was at a neighboring bar one evening in 2007. *See* Defs.' Obj. at 5-6. This allegation alone does not discredit the expert report or Plaintiff's testimony that Defendants contacted her without any consent.

named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). Moreover, although "[t]he commonality and typicality requirements tend to merge into one another," *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997), Defendants have not objected to Judge Pitman's conclusion that Plaintiff demonstrated commonality.

The Court also finds no clear error in Judge Pitman's predominance finding. Class-wide issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016). "[I]ndividual questions need not be absent," but "[t]he rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Sykes*, 780 F.3d at 81. The purpose of this inquiry is to ensure that "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Before Judge Pitman, Defendants argued that the class should not be certified because individualized inquiries into (1) whether a class member gave consent and, if so, (2) what consent standard applied, would predominate. But as Judge Pitman noted, "Defendants' argument is predicated on the assumption that the court would need to apply the pre-2013 express consent standard to some class members and the more stringent prior express written consent standard to other class members." Rpt. at 21-22. This "assumption," the Court reiterates, is incorrect. *Id.*

"There is," therefore, "no need for an individualized inquiry concerning the issue of consent." *Id.* at 23. The proposed class was purposefully defined to avoid individualized

inquiries by only including individuals who were contacted by Defendants after the FCC's 2012 Order. Moreover, Defendants have not offered any affirmative evidence – despite already engaging in discovery – that casts doubt on Plaintiff's assertion that they lacked consent from any of the putative class members. *See id.* at 25 (finding Defendants' contention that it had consent from some putative class members "too speculative to defeat a finding of predominance"); *see also Trenz*, 2017 WL 6539019, at *8 (certifying a TCPA class over the defendants' objection to predominance because "[t]he Court . . . need[s] significantly more evidence from Defendants in order to find that these potential individualized inquiries actually predominated over the common questions").

With one consent standard applicable to the whole class, only a generalized inquiry as to consent would be necessary. Predominance is therefore established. *See e.g., Allard v. SCI Direct, Inc.*, No. 16-CV-1033, 2017 WL 3236448, at *5 (M.D. Tenn. July 31, 2017) ("[W]hether [the defendant] had a practice of obtaining consent in a way sufficient to satisfy 'prior express written consent' is a common question that predominates in this action."); *Zeidel v. A&M, LLC*, No. 13-CV-6989, 2017 WL 1178150, at *5 (N.D. Ill. Mar. 30, 2017) ("Common questions of law and fact related to Defendant's alleged uniform practice of sending substantially similar text messages to the class members . . . and alleged lack of written consent predominate over any individualized issues.").

## II. Judge Pitman's Remaining Rule 23 Findings

Defendants have not objected to the Report's recommendation that the other Rule 23 requirements are met. The Court, therefore, reviews them for clear error. *See Razzoli*, 2014 WL 2440771, at *5.

13

## A. Rule 23(a)

The Court previously addressed typicality. It now considers Judge Pitman's conclusion that numerosity, commonality, and adequacy are also met.

### i. Numerosity

Judge Pitman concluded that numerosity was established because Plaintiff identified 67,630 putative class members. "The numerosity requirement provides that the class must be 'so numerous that joinder of all members is impracticable.'" *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)(1)); *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("[N]umerosity is presumed at a level of 40 members."). Such a large putative class easily satisfies Rule 23(a).

### ii. Commonality

Commonality "require[s] a plaintiff to show that 'there are questions of law or fact common to the class.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (quoting Fed. R. Civ. P. 23(a)(2); *Jackson v. Bloomberg L.P.*, 298 F.R.D. 152, 162 (S.D.N.Y. 2014) ("[A] single common legal or factual question will suffice."). Generally, a plaintiff must "demonstrate that the class members have suffered the same injury." *Jackson*, 298 F.R.D. at 162; *see also Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 175 (S.D.N.Y. 2014) ("[P]laintiffs may meet the commonality requirement where the individual circumstances of class members differ, but 'their injuries derive from a unitary course of conduct by a single system.'" (citation omitted)). This inquiry "depend[s] upon a common contention . . . that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

The Court agrees that Plaintiff established commonality. Both common facts – that Defendants sent promotional texts to the individual class members using an ATDS – and law – whether Defendants had the requisite consent – are present. *See Johnson v. Nextel Commc'n, Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("Where the same conduct or practice by the same defendants gives rise to the same kind of claims from all class members, there is a common question."). Moreover, each class member "suffered the same injury – the receipt of unwanted promotional text messages." Rpt. at 13. Although the putative class members' factual circumstances might differ slightly, such as in the number of texts an individual received, there is a "unifying thread among the members' claims that warrant[s] class treatment." *Johnson v. Nextel Commc'n, Inc.*, 293 F.R.D. 660, 670 (S.D.N.Y. 2013).

### iii. Adequacy

Rule 23(a) also requires establishing adequacy of representation, meaning that "representatives will fairly and adequately protect the interests of the class." *Amchem Prods., Inc.*, 521 U.S. at 613. This inquiry seeks to uncover whether "the proposed class representative . . . h[as] an interest in vigorously pursuing the claims of the class, and . . . h[as] no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). It also considers whether "plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings*, 574 F.3d at 35.

At no point in this litigation have Defendants disputed the adequacy of Plaintiff's counsel or Plaintiff's ability to represent the putative class. Judge Pitman also did not identify any conflict between Plaintiff and the class, and deemed Plaintiff's counsel qualified based on his

15

"detailed outline of his qualifications and experiences" as counsel for previous class and TCPA actions. Rpt. at 18; *see also* Kristensen Decl. ¶ 24-35.

### iv.    Ascertainability

The Second Circuit has "recognized an 'implied requirement of ascertainability' in Rule 23." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (citation omitted). "[T]he touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.*

Judge Pitman correctly concluded that Plaintiff's proposed class is ascertainable. Although Plaintiff proposes a large class, there are "objective criteria that are administratively feasible" to identify the class members. *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010). That is, namely, each individual's cell phone number can be found on a list, which Plaintiff's expert used in creating his report. While Defendants dispute the scope of the class and that they lacked consent to send the messages, they have not otherwise contested the ability to identify the class.

### C.  Rule 23(b)

As previously discussed, the Court adopts Judge Pitman's recommendation that Plaintiff established predominance – the first of Rule 23(b)(3)'s requirements. The Court also agrees with Judge Pitman's assessment that the second requirement – superiority – is met. Superiority is determined based on several considerations, including "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

and (D) the likely difficulties in managing a class action." *In re U.S. Foodserv. Inc. Pricing Litig.*, 729 F.3d 108, 130 n.15 (2d Cir. 2013) (quoting Fed. R. Civ. P. 23(b)(3)). "While Rule 23(b)(3) sets out four individual factors for courts to consider, manageability is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication." *Sykes*, 780 F.3d at 82.

There is no indication – either identified by Defendants or to be found in the record – that any class member has a unique individual interest in controlling this litigation or has already brought an action against Defendants. Moreover, with Defendants' business located in the Southern District of New York, this is the desirable forum to litigate this matter. Nor is there an identifiable difficulty in managing this class action. Finally, the Court notes that, because each claim asserted individually is statutorily limited to $500, *see* 47 U.S.C. § 227(b)(3)(B), these TCPA individual claims are unlikely to be brought or successful. In this instance, therefore, the class action mechanism is a superior method. *See Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 294 (S.D.N.Y. 2012).

## CONCLUSION

Accordingly, the Court adopts Judge Pitman's recommendation and grants Plaintiff's

motion for class certification. The Clerk of Court is respectfully directed to lift the stay in this

matter and terminate the motions pending at docket entries 57 and 85. No later than February

14, 2020, the parties shall submit a joint letter to the Court regarding proposed next steps,

including whether a referral to Magistrate Judge Cave or to the district's mediation program for

settlement discussions would be useful at this time.

Dated:    January 13, 2020
          New York, New York

RONNIE ABRAMS
United States District Judge